**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

United States of America,

Plaintiff,

v.

Feisel Mohamed Elmi,

Defendant.

Case No. 26-CR-191 (ECT/ECW

**DEFENDANT'S OBJECTION TO MOTION TO REVOKE PRETRIAL RELEASE**

---

## INTRODUCTION

The Government asks this Court to incarcerate a presumptively innocent man because two former employees of his company declined invitations to participate in voluntary interviews with federal law enforcement. To accomplish this, the Government characterizes the exercise of an individual's right not to speak voluntarily with investigators as evidence of criminal witness tampering, omits material context concerning Mr. Elmi's previously disclosed travel plans, and invites the Court to substitute prosecutorial suspicion for the findings required by Congress under 18 U.S.C. § 3148. This Court should decline that invitation.

The distinction between lawful conduct and criminal obstruction is not a technicality. It is fundamental to our constitutional system. Individuals are not obligated to submit to voluntary law enforcement interviews. Nor does a witness's decision to decline such an interview, without more, establish that a defendant has engaged in corrupt persuasion. The Supreme Court has expressly recognized that

persuasion, even persuasion resulting in the withholding of information from the Government, is not inherently criminal. *Arthur Andersen LLP v. United States*, 544 U.S. 696, 703–06 (2005).

Yet the Government's motion proceeds as though the cancellation of two voluntary interviews establishes a federal felony, and as though the allegation of that felony necessarily warrants pretrial incarceration. Neither proposition follows from the governing law.

These allegations are particularly serious because the Government seeks to deprive Mr. Elmi of his liberty before trial, despite his compliance with the Court's travel restrictions, his voluntary disclosure of the international travel plans the Government now attempts to characterize as evidence of flight, and the absence of any meaningful showing that appropriately tailored conditions could not address its stated concerns.

Mr. Elmi respectfully requests that the Court deny the Government's motion. At a minimum, he requests a prompt evidentiary hearing at which the Government must substantiate its allegations with evidence rather than inference, speculation, and secondhand characterizations of disputed communications.

## I. THE GOVERNMENT FAILS TO ESTABLISH PROBABLE CAUSE THAT MR. ELMI ENGAGED IN CRIMINAL WITNESS TAMPERING

### A. The Government's Theory Disregards the Actual Language of 18 U.S.C. § 1512(b)(3).

The Government alleges that Mr. Elmi violated 18 U.S.C. § 1512(b)(3). That statute prohibits knowingly using intimidation, threats, corrupt persuasion, or misleading conduct toward another person, with the intent to hinder, delay, or prevent communication to federal law enforcement concerning the commission or possible commission of a federal offense. 18 U.S.C. § 1512(b)(3). The statute does not criminalize every communication that precedes a witness's decision not to speak with investigators. It does not prohibit truthful statements about the existence of legal representation. And it does not make a defendant criminally responsible merely because a third party subsequently declines a voluntary interview.

The Supreme Court addressed the limits of corrupt persuasion in *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005). There, the Court explained that persuasion is not inherently wrongful and that the statutory requirement of corrupt persuasion incorporates consciousness of wrongdoing. *Id.* at 703–06. The Court recognized that individuals may lawfully persuade others to exercise legal rights, including rights that result in information being withheld from investigators. The critical distinction is between lawful persuasion and persuasion undertaken with the requisite wrongful intent.

That distinction matters here. The Government alleges that two former Aspen employees declined or canceled voluntary interviews after receiving communications from Mr. Elmi. But those decisions do not establish that Mr. Elmi knowingly engaged in corrupt persuasion or misleading conduct. A person may decline a voluntary law enforcement interview for any number of lawful reasons. The Government has no entitlement to voluntary cooperation, and the exercise of an individual's right to decline an interview is not itself evidence of criminal wrongdoing. The Government must establish the elements of the offense it alleges. It cannot satisfy that burden merely by pointing to an outcome it dislikes.

### B. The Government Materially Mischaracterizes Mr. Elmi's Communications About Aspen's Legal Representation.

The Government's allegations rest substantially on the assertion that Mr. Elmi falsely represented that his attorney personally represented former Aspen employees. Mr. Elmi disputes that characterization.

Mr. Elmi informed former employees that Aspen Associates LLC was represented by counsel and provided them with the name and contact information of that counsel: the undersigned, Caroline Brunkow. That underlying representation was accurate.

The undersigned has represented Aspen since April 2026, a fact the Government expressly acknowledges in its motion. (Dkt. 19 at 2.) Mr. Elmi provided counsel's contact information on his own initiative. There is a legally significant distinction between informing a person that a business is represented by counsel and

falsely claiming that counsel has undertaken individual representation of that person. The Government collapses that distinction.

The Government further asserts that, upon Mr. Elmi's indictment, Ms. Brunkow necessarily would have been conflicted from representing anyone else associated with Aspen. (Dkt. 19 at 4.) That categorical assertion is unsupported. The representation of an organizational client is distinct from representation of its individual constituents. *See* Minn. R. Prof. Conduct 1.13. Whether counsel may also represent an individual associated with an organization depends on the circumstances and applicable conflict-of-interest rules. An indictment does not, by itself, terminate the organization's existing attorney-client relationship nor establish an automatic conflict with every person associated with it.[1] More fundamentally, the Government's speculation about potential conflicts does not establish that Mr. Elmi knowingly made a false statement.

The Government also emphasizes that former employees previously spoke with investigators without mentioning counsel. But the fact that a witness previously participated in an interview without counsel does not establish that the witness must continue doing so, that the witness may not subsequently seek legal advice, nor that information about the company's existing representation was false. Nor does the Government's assertion that Ms. Brunkow "never contacted investigators on behalf

[1] Practically, counsel acknowledges that it is preferential for all parties that Aspen Associates be separately represented to avoid any potential appearance of impropriety. But it does not follow that Mr. Elmi made incorrect assertions.

of individual employees" establish criminal conduct by Mr. Elmi. The relevant question is what Mr. Elmi actually communicated, whether those communications were knowingly false or corrupt, and whether he possessed the requisite criminal intent. The Government's motion does not adequately establish those propositions.

### C. The Government Improperly Conflates a Witness's Decision Not to Participate in a Voluntary Interview with Criminal Obstruction.

The Government describes two former Aspen employees who declined or canceled trial-preparation interviews. With respect to Witness 1, the Government alleges that the witness reported being instructed not to speak with law enforcement and being told that counsel represented former Aspen employees. With respect to Witness 2, the Government alleges that the witness received a voicemail referencing an attorney named Caroline and subsequently canceled a scheduled interview. These are materially different allegations, and neither should be resolved through imprecise summaries.

The Government does not attach the voicemail reportedly received by Witness 2. It provides no verbatim transcription of the communications. Nor does it identify the precise language on which it relies to distinguish lawful advice about voluntary cooperation from criminal corrupt persuasion. The distinction is essential.

A witness's decision to decline an interview is not synonymous with an agreement to provide false testimony, conceal evidence, destroy documents, or refuse to comply with lawful compulsory process. To be clear, § 1512(b)(3) does not require the Government to establish that a witness was instructed to lie. Corruptly

persuading a person to withhold information from law enforcement can violate the statute even without false testimony. But the Government must establish the wrongful means or intent required by the statute. The mere fact that an interview did not occur cannot substitute for that showing. The Government's motion repeatedly treats the cancellation of voluntary interviews as proof of corrupt persuasion rather than as an outcome whose circumstances must be examined. That reasoning is insufficient to establish probable cause for a federal felony.

## II. THE GOVERNMENT HAS FAILED TO ESTABLISH THAT PRETRIAL DETENTION IS WARRANTED UNDER 18 U.S.C. § 3148(B).

Even if the Government could establish probable cause to believe that Mr. Elmi violated federal law while on pretrial release—which it cannot—the inquiry would not end there. Section 3148(b) requires a separate determination that either (1) no condition or combination of conditions will reasonably assure the defendant's appearance and the safety of the community, or (2) the defendant is unlikely to abide by any condition or combination of conditions of release. *See* 18 U.S.C. § 3148(b)(2).

The Government's motion largely collapses these distinct statutory requirements into a single accusation: because Mr. Elmi allegedly engaged in "witness tampering," he must be detained. That is not the statutory test. Congress did not authorize automatic detention upon an allegation of misconduct, and the Government cannot circumvent the required individualized assessment by repeatedly characterizing disputed conduct as criminal.

### A. Mr. Elmi Is Not a Flight Risk, and the Government's Characterization of His International Travel Is Materially Misleading.

The Government repeatedly invokes Mr. Elmi's international travel plans as evidence that he intended to evade prosecution. It characterizes his purchase of a one-way ticket to the United Kingdom as a "clear attempt to avoid any legal ramifications" and further references the international relocation of his family. (Dkt. 19 at 7–8.) What the Government omits is at least as important as what it includes.

It was the defense that affirmatively disclosed Mr. Elmi's international travel plans to the Court *during* his first appearance. Mr. Elmi sought permission to travel to visit his young children. He did not disregard the Court's authority. He sought its permission. Mr. Elmi has now also surrendered his passport. These are not the actions of a person attempting to evade judicial supervision. They are the actions of a defendant who understands that his liberty is subject to the Court's authority and who has taken affirmative steps to comply with that authority.

The Government's effort to transform these circumstances into evidence of flight risk is particularly troubling. It takes information voluntarily disclosed by the defense in the interest of transparency and compliance, removes the context in which that information was provided, and presents it as evidence of an intent to flee. That is not a fair characterization of the record. Nor does the fact that Mr. Elmi's family resides internationally establish that he intends to abscond. The Government identifies no attempt by Mr. Elmi to depart in violation of his conditions of release, no failure to appear, and no effort to evade supervision since his release.

The Government's reliance on Mr. Elmi's financial transactions and foreign property ownership is similarly misleading. The Government asserts that Mr. Elmi transferred more than $500,000 to "Africa" and purchased property there, inviting the Court to infer that these transactions demonstrate an intent to flee. (Dkt. 19 at 8.) But the Government omits a critical fact: it knows about these transactions because ***Mr. Elmi disclosed them in his tax filings***. The Government cannot fairly present these transactions as evidence of an effort to evade prosecution while withholding the fact that Mr. Elmi affirmatively reported them to the federal government. There is no allegation in the motion that these transactions violated any law, that the property was acquired in anticipation of these proceedings, or that Mr. Elmi attempted to conceal either the transfers or the property from federal authorities.

The Government's presentation is particularly troubling when considered alongside its characterization of Mr. Elmi's international travel. In both instances, the Government takes information that Mr. Elmi voluntarily disclosed and repurposes it as evidence of an intent to flee, without acknowledging the circumstances of that disclosure. Foreign property ownership and international financial transactions are not themselves evidence of criminal intent. Nor does maintaining financial or familial connections outside the United States establish that an individual will disregard the authority of a federal court.

The relevant inquiry is whether Mr. Elmi presents a risk of nonappearance that cannot reasonably be addressed through conditions of release. The Government has

not established that his disclosed financial transactions, considered alongside his surrender of his passport and his efforts to obtain judicial permission before traveling, satisfy that standard. The Bail Reform Act requires an individualized assessment of actual risk. It does not permit the Government to substitute speculation arising from a defendant's international family connections, foreign property interests, or travel history for evidence that he is likely to evade prosecution.

### B. The Government Has Not Established That Mr. Elmi Presents a Danger to Any Person or the Community.

The Government fares no better in its effort to establish dangerousness. Mr. Elmi is charged with nonviolent financial offenses. The Government does not allege that he has threatened either witness, engaged in violence, attempted to intimidate anyone physically, or directed anyone to provide false testimony. Instead, its dangerousness argument depends almost entirely on its disputed characterization of communications concerning Aspen's legal representation and the subsequent decisions of two former employees not to participate in voluntary law enforcement interviews. As explained above, Mr. Elmi informed former employees that Aspen was represented by counsel and provided counsel's contact information on his own initiative. The Government's assertion that these communications constituted corrupt persuasion is disputed and requires evidentiary examination. To be clear, interference with witnesses can constitute a serious danger to the integrity of judicial proceedings, even in the absence of violence. But the seriousness of actual witness tampering does not relieve the Government of its obligation to establish that such

misconduct occurred. The Government cannot establish dangerousness simply by attaching the label “witness tampering” to disputed communications and then treating that characterization as an established fact.

If the Court finds probable cause to believe that Mr. Elmi committed a federal felony while on release, § 3148(b) creates a rebuttable presumption concerning danger to the community. That presumption, however, does not eliminate the Court’s obligation to evaluate the available information and determine whether conditions of release can adequately address the identified risk. Here, the nature of the alleged communications, Mr. Elmi’s compliance with the Court’s travel restrictions, his sole criminal history consisting of a misdemeanor from when he was 23 years old, and the availability of conditions directly addressing witness contact all weigh against the extraordinary remedy of detention.

### C. Mr. Elmi's Conduct Demonstrates His Willingness to Comply With the Court's Authority.

The Government asserts that Mr. Elmi is unlikely to abide by any condition or combination of conditions of release. Yet it identifies no violation of an express travel restriction, no failure to appear, and no refusal to comply with the Court's supervision.

Mr. Elmi has surrendered his passport. He sought judicial permission for international travel. And, apart from the disputed conduct underlying the present motion, the Government identifies no instance in which he has failed to comply with the conditions imposed by this Court. Further, Mr. Elmi also has no significant

criminal history. As defense counsel previously advised the Government, his history consists of a misdemeanor disorderly conduct offense from when he was approximately 23 years old.

The Government's conclusion that Mr. Elmi will disregard any conditions of release is therefore unsupported by the broader record of his conduct under supervision. Indeed, the Government's argument is circular. It asserts that Mr. Elmi engaged in witness tampering, concludes from that disputed allegation that he cannot be trusted to comply with release conditions, and then insists that no modification could possibly address its concerns. Section 3148(b) requires more than that.

**D. The Government Has Failed to Demonstrate Why Additional Conditions of Release Would Be Inadequate.**

Perhaps most strikingly, the Government does not meaningfully address the obvious alternatives to incarceration. If the Government's concern is that Mr. Elmi may communicate with potential witnesses, the Court can impose a narrowly tailored restriction on such communications. Notably, conditions that counsel offered in an attempt to reach a resolution with the Government and avoid wasting judicial resources. If the Government is concerned about international travel, Mr. Elmi has already surrendered his passport and remains subject to the Court's travel restrictions. The Government offers no persuasive explanation why these measures, individually or in combination with additional supervision, would be inadequate. Instead, it simply asserts that modification of release conditions would not deter

future misconduct. (Dkt. 19 at 7.) That assertion is a conclusion, not an evidentiary showing.

The Government bears the burden of establishing the statutory grounds for revocation. Its disagreement with Mr. Elmi's conduct, or its dissatisfaction with the decisions of potential witnesses not to participate in voluntary interviews, cannot substitute for the findings required by § 3148(b). Pretrial detention is not a mechanism for punishing a defendant for frustrating the Government's investigative preferences. Nor is it a means of securing the Government's preferred level of witness cooperation. Mr. Elmi remains presumed innocent. His liberty may not be revoked merely because the Government believes its prosecution would proceed more conveniently if he were incarcerated.

For these reasons, even if the Court were to find that the Government satisfied the initial requirement of § 3148(b)(1), the Government has not established that detention is warranted under § 3148(b)(2). The motion should be denied.

## III. THE GOVERNMENT'S REQUEST FOR PRETRIAL INCARCERATION MUST BE EVALUATED AGAINST THE EXECUTIVE BRANCH'S DOCUMENTS RHETORIC CONCERNING THE MINNESOTAN SOMALI COMMUNITY.

The Government's motion does not arise in a vacuum. It arises against the backdrop of repeated public statements by the highest rungs of leadership within the executive branch associating Minnesota's Somali community with criminality, federal law enforcement activity involving a prominent Somali American elected official immediately before the midterm elections, and an express presidential directive to focus federal attention on alleged fraud in Minnesota. Mr. Elmi does not contend that his ethnicity immunizes him from investigation or prosecution. Nor does he ask the Court to adjudicate the political merits of the Administration's policies. He asks that the Government be held to the law, that its allegations be subjected to meaningful scrutiny, and that his liberty not be revoked based on disputed facts and inferences unsupported by the governing statute.

### A. The President Has Repeatedly Associated Somali Identity with Criminality.

On December 2, 2025, President Donald Trump publicly disparaged Somali immigrants during a Cabinet meeting, describing them as "garbage" and stating that he did not want them in the United States. This rhetoric has continued throughout 2026.

During his February 2026 State of the Union address, the President singled out Minnesota's Somali community in discussing alleged fraud, described members of

that community as "pirates," and advanced a multibillion-dollar fraud estimate that had not been established by the publicly available evidence.

On October 8, 2026, the President again singled out Somali immigrants, publicly associating the community with violence, criminality, and disorder.

These statements were not made by private citizens unconnected to federal law enforcement. They were made by the President, who heads the Executive Branch responsible for the Department of Justice.

On October 12, 2026, federal agents searched the Washington, D.C., residence of Representative Ilhan Omar, a Somali-born member of Congress and prominent critic of the President. The search occurred approximately three weeks before the November 3 midterm elections, during Representative Omar's reelection campaign. The Department of Justice stated that the search was conducted pursuant to a judicially authorized warrant. Representative Omar characterized the operation as political intimidation. The timing prompted public scrutiny concerning the Department's longstanding policy against overt investigative actions involving candidates close to elections.

Mr. Elmi's own arrest occurred on October 29, 2026—five days before those same midterm elections. With Kash Patel and other members of the Cabinet arriving in Minnesota—though, confusingly, St. Cloud—to deliver a press conference immediately following his arrest in which Mr. Elmi was mentioned by name. By that time, the Government knew that Mr. Elmi had counsel. Ms. Brunkow had represented

Aspen since April 2026 and spoke directly with Deputy Chief Sara Porter the day before Mr. Elmi's arrest. Nevertheless, rather than arrange for a voluntary surrender, the Government proceeded with an arrest involving over ten federal agents swarming Mr. Elmi from multiple angles as he approached his vehicle outside of his gym. Mr. Elmi would have voluntarily surrendered had the opportunity been extended.

While, the defense does not contend that the Government is categorically required to arrange a voluntary surrender instead of employ a substantial and tax-payer costly law enforcement presence while the Cabinet travels to Minnesota to make public remarks, it is worth noting that despite the availability of counsel and no identified refusal to appear, the Government continues its subsequent effort to portray Mr. Elmi as evasive and unwilling to submit to judicial authority.

Further, this prosecution is not staffed exclusively by attorneys from the United States Attorney's Office for the District of Minnesota. Mr. Manu J. Sebastian is a Trial Attorney with the Department of Justice's National Fraud Enforcement Division. His involvement reflects direct participation by the folks over in DC in this Minnesota case. That institutional involvement is significant in light of the Administration's express focus on alleged fraud in Minnesota.

Just yesterday, President Trump publicly directed Vice President JD Vance to devote his attention to alleged fraud and corruption in Democratic-led jurisdictions, specifically identifying Minnesota, California, and Illinois. Indeed, this assignment was declared on Truth Social to be more imperative than reaching a deal to end an

ongoing war in Iran. The following day, the prosecution team, including Mr. Sebastian, has now filed the present motion seeking Mr. Elmi's pretrial incarceration.[2] The DOJ's participation in a prosecution falling within the Administration's publicly identified priorities is relevant context.

The Department of Justice's Principles of Federal Prosecution prohibit decisions based on race, ethnicity, national origin, religion, or political association. *See* Justice Manual § 9-27.260. Department policy also prohibits selecting the timing of investigative steps or criminal charges for the purpose of affecting an election. *See* Justice Manual § 9-85.500. While these policies do not independently establish that misconduct occurred in this case, nor do they create an automatic entitlement to dismissal or release; they do illustrate longstanding institutional principles that are especially important when federal criminal prosecutions occur amid explicit political rhetoric concerning the accused's community.

The Fifth Amendment's guarantee of due process includes equal-protection principles that prohibit federal prosecutorial decisions based on impermissible classifications. *See United States v. Armstrong*, 517 U.S. 456, 464–65 (1996). Mr. Elmi is not presently asking the Court to adjudicate a fully developed vindictive or selective-prosecution claim under *Armstrong.* He is asking that this detention request

[2] The defense does not assert without evidence that the President personally directed the filing of this motion or that Mr. Sebastian acted pursuant to an express political instruction.

be evaluated on an individualized evidentiary record, without assumptions arising from the political climate surrounding Minnesota fraud prosecutions.

The Government is entitled to investigate and prosecute offenses supported by evidence. It is not entitled to substitute political rhetoric, collective suspicion, or unsupported inferences for the statutory findings necessary to incarcerate a defendant before trial. And the Government's burden does not diminish because the defendant belongs to a community publicly targeted by political rhetoric. Nor does the presumption of innocence become less meaningful because the prosecution concerns allegations that have received national political attention.

Mr. Elmi is entitled to the same statutory protections, the same individualized consideration, and the same impartial administration of justice as every other person appearing before this Court. His liberty is not less worthy of protection because he is Somali. His family relationships are not inherently more suspicious because they cross international borders. And the Government's allegations are not entitled to greater deference because they arise in a politically prominent category of federal prosecutions. The Court should require evidence, apply the statutory standards faithfully, and reject any suggestion that the broader political environment supplies a reason to relax the Government's burden.

## IV. An Evidentiary Hearing is Necessary Before the Court May Revoke Mr. Elmi's Release.

Section 3148(b) expressly requires a hearing before the Court may enter an order revoking pretrial release. Here, the material factual disputes are substantial. The Government's allegations turn on what Mr. Elmi actually said to former Aspen employees, whether he made any knowingly false representation concerning counsel, whether his communications were undertaken with corrupt intent, and whether those communications caused or were intended to cause unlawful interference with federal law enforcement. The defense disputes the Government's characterization of those communications.

The Government also relies on contested inferences concerning Mr. Elmi's international travel, financial transactions, and purported risk of nonappearance. These disputes should not be resolved through competing attorney representations alone. The defense respectfully requests an evidentiary hearing at which the Government presents the underlying evidence supporting its allegations, including testimony from Witness 1 and Witness 2 with the personal knowledge necessary to resolve material factual disputes. The defense further requests production sufficiently in advance of the hearing of:

- The voicemail allegedly received by Witness 2, including the original recording and any available transcript;
- Any other recordings, messages, or communications between Mr. Elmi and the witnesses identified in the Government's motion;

- Reports, notes, or memoranda memorializing Witness 1 and Witness 2 contacts and interviews;
- The evidence supporting the Government's assertion that Mr. Elmi contacted additional former employees for an unlawful purpose; and
- The materials on which the Government relies to establish the timing, nature, and alleged flight-related significance of the international travel and financial transactions identified in its motion.

The defense also requests the opportunity to examine the witnesses necessary to test the Government's factual allegations, subject to the Court's determination of the appropriate procedures for the hearing. The Government seeks an extraordinary deprivation of liberty. The Court should require an evidentiary record sufficient to support the findings Congress mandates.

## CONCLUSION

The Government has not established that Mr. Elmi committed criminal witness tampering. It has not demonstrated that he presents a flight risk or danger that cannot be addressed through conditions of release. And it has not shown that he is unlikely to abide by any condition or combination of conditions. Instead, the Government asks the Court to infer criminal conduct from disputed communications concerning legal representation and the cancellation of voluntary interviews, while omitting material context concerning Mr. Elmi's former travel plans, passport surrender, and financial disclosures. The Government's allegations must be assessed under the law, not

accepted because of the seriousness with which the Government characterizes them.

Mr. Elmi remains presumed innocent.

Dated: November 13, 2026

s/ *Caroline H. Brunkow*
Caroline H. Brunkow, Reg. No. 0398936
Lotus Legal PLLC
331 Second Avenue S, Ste. 420
Minneapolis, MN 55401
(612) 293-6963
Cari@LotusLegalPLLC.com

*Counsel for Defendant*