**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

United States of America,

Plaintiff,

v.

Feisel Mohamed Elmi,

Defendant.

Case No. 26-CR-191 (ECT/ECW

**DEFENDANT'S REPLY IN SUPPORT FOR REQUEST FOR DISCOVERY**

---

## INTRODUCTION

On November 13, 2026, the Government publicly accused Mr. Elmi of committing an additional federal felony and asked this Court to incarcerate him pending trial on that basis. (Dkt. 19.) In response, Mr. Elmi disputed those allegations and requested production of the evidence purportedly supporting them. (Dkt. 20 at 19–20.)

This Court directed the parties to meet and confer regarding Mr. Elmi's discovery requests and expressly ordered the Government, to the extent it objected to producing the requested discovery before the November 30 hearing, to articulate the legal and factual bases for those objections on or before November 20, 2026.

The Government has neither confirmed that it has or will produce each of the five categories of requested discovery nor articulated a legal or factual basis for withholding it. Instead, the Government filed a three-page submission abandoning its request for pretrial incarceration while continuing to publicly characterize Mr. Elmi's

conduct as criminal witness tampering. (Dkt. 25.) In support of that characterization, the Government attached a screenshot of an apparently automated transcription of a voicemail that expressly references additional communications the Government has not produced. (Dkt. 25-1.)

Mr. Elmi renews his request for production of each category of discovery identified in his Objection.

## I. THE GOVERNMENT DID NOT RESPOND TO THIS COURT'S DISCOVERY DIRECTIVE.

This Court's directive was unambiguous. To the extent the Government objected to producing the requested discovery before the November 30 hearing, it was required to explain the legal and factual bases for its objections. The Government's November 20 submission does not identify a single objection to the requested discovery. It does not cite a single legal authority supporting nonproduction. It does not identify any factual circumstance preventing production. It does not even address the substance of Mr. Elmi's discovery requests. The Government's decision to revise its requested relief is not a response to this Court's directive. Nor does the Government's unilateral decision to abandon its request for incarceration extinguish Mr. Elmi's interest in defending himself against the serious allegations the Government has placed on the public record.

The Government continues to allege that Mr. Elmi engaged in criminal witness tampering. Indeed, its November 20 submission reiterates that allegation and characterizes its proposed modification of release conditions as necessary to prevent

future attempts to tamper with witnesses. (Dkt. 25 at 2.) The Government has not withdrawn its allegations. It has merely revised the relief it seeks on the basis of those allegations. Mr. Elmi is entitled to contest them.

The Government should not be permitted to publicly accuse an individual of committing a federal felony, seek his incarceration, and then insulate those allegations from meaningful scrutiny by retreating from its original requested relief. The defense requested the evidence underlying the Government's allegations. This Court afforded the Government an opportunity to explain why that evidence should not be produced. The Government has offered no such explanation. The evidence should be produced.

## II. MR. ELMI IS ENTITLED TO THE FIVE CATEGORIES OF DISCOVERY REQUESTED.

Mr. Elmi's November 13 Objection identified five discrete categories of discovery: (1) the voicemail allegedly received by Witness 2, including the original recording and any available transcript; (2) any other recordings, messages, or communications between Mr. Elmi and the witnesses identified in the Government's motion; (3) reports, notes, or memoranda memorializing Witness 1 and Witness 2 contacts and interviews; (4) the evidence supporting the Government's assertion that Mr. Elmi contacted additional former employees for an unlawful purpose; and (5) the materials on which the Government relies to establish the timing, nature, and alleged flight-related significance of the

international travel and financial transactions identified in its motion. (Dkt. 20 at 19–20.)

Each of these requests was specifically directed to an affirmative factual representation the Government made to this Court in support of its request to incarcerate Mr. Elmi. The Government's supplemental submission only reinforces the necessity of that discovery.

### A. The Voicemail Allegedly Received by Witness 2, Including the Original Recording and Any Available Transcript.

The Government purports to substantiate its allegations concerning Witness 2 through a screenshot of what appears to be a machine-generated transcription of a voicemail. (Dkt. 25-1.) The Government has not produced the actual recording.

The exhibit itself contains apparent transcription errors, provides no calendar date for the communication, and includes a redacted link through which the recipient could listen to the full voice message. Notably, the purported transcription repeatedly identifies the attorney in question as Aspen's attorney. This fact that is entirely consistent with a material aspect of Mr. Elmi's account. Rather than engage in competing interpretations of an incomplete and potentially inaccurate transcription, the defense requests what it has requested from the outset: the original recording.

The Government cannot reasonably expect Mr. Elmi to defend himself against its characterization of his words while withholding the recording of those words. The Government has articulated no legal or factual basis for failing to produce the original voicemail.

**B. Any Other Recordings, Messages, or Communications Between Mr. Elmi and the Witnesses Identified in the Government's Motion.**

The Government's own exhibit expressly references additional communications, including a second voicemail and a text message containing or concerning counsel's contact information. (Dkt. 25-1 at 2.) The existence of additional communications is particularly significant because the Government's allegations turn on the meaning and intent of Mr. Elmi's communications concerning legal representation. The complete content, timing, and sequence of those communications are directly relevant to that inquiry.

The Government has elected to present a purported transcription of one communication while omitting additional communications expressly referenced therein. Mr. Elmi should not be required to defend himself against a selectively presented account of his communications when the additional communications may provide material context for the very statements the Government characterizes as criminal.

The Government has articulated no legal or factual basis for withholding these materials.

**C. Reports, Notes, or Memoranda Memorializing Witness 1 and Witness 2 Contacts and Interviews.**

The Government's original motion relied substantially on representations concerning information provided to law enforcement by Witness 1 and Witness 2. (Dkt. 19.) The Government now acknowledges that Witness 1 has since met with law

enforcement and agreed to meet with law enforcement again. (Dkt. 25 at 2.) The Government has not produced the materials memorializing those subsequent communications. Nor has it produced the requested materials memorializing the original witness contacts and interviews upon which its allegations were predicated.

The defense is entitled to examine whether the Government's characterizations accurately reflect what these witnesses reported, whether the witnesses subsequently clarified or qualified their statements, and whether information obtained during subsequent interviews is inconsistent with the Government's original allegations.

This is particularly important where the Government expressly attributes its decision to abandon its request for incarceration, at least in part, to newly acquired information. What information did the Government receive? What did Witness 1 subsequently communicate to law enforcement? Did either witness provide information inconsistent with the representations the Government made to this Court on November 13? These are legitimate and material questions arising directly from the Government's own filings.

The defense requests production of the reports, notes, and memoranda memorializing the Government's contacts and interviews with both witnesses, including those occurring after the filing of its original motion. The Government has articulated no legal or factual basis for withholding these materials.

### D. The Evidence Supporting the Government's Assertion That Mr. Elmi Contacted Additional Former Employees for an Unlawful Purpose.

The Government's allegations were not limited to Witness 1 and Witness 2. In its original motion, the Government affirmatively represented to this Court that it had reason to believe Mr. Elmi contacted other former employees to corruptly persuade them not to speak with law enforcement. (Dkt. 19 at 8.) That is a serious allegation. It suggests a broader pattern of criminal conduct extending beyond the two individuals identified in the Government's motion.

The Government's November 20 submission does not address that allegation. It neither withdraws the allegation nor identifies the evidence upon which it was based. What was the factual basis for making that representation to this Court? What evidence did the Government possess when it publicly alleged that Mr. Elmi had engaged in a broader effort to interfere with its investigation? If the Government possessed evidence supporting that allegation, it should produce it. If the Government did not possess such evidence, it should expressly correct its representation to this Court. The Government should not be permitted to leave an allegation of additional criminal conduct on the public record while declining to disclose the evidentiary basis for making it.

The Government has articulated no legal or factual basis for withholding the requested evidence.

### E. The Materials on Which the Government Relies to Establish the Timing, Nature, and Alleged Flight-Related Significance of Mr. Elmi's International Travel and Financial Transactions.

The Government also publicly characterized Mr. Elmi's former international travel plans as a clear attempt to avoid the legal consequences of his alleged conduct. (Dkt. 19 at 7.) It further relied on financial transfers to Africa, foreign property ownership, and the international residence of his family to characterize him as a flight risk with limited ties to this community. (*Id.* at 8.) As explained in Mr. Elmi's Objection, those representations omit material context, including the defense's disclosure of his proposed international travel, his surrender of his passport, and the disclosure of his financial affairs through his tax filings. (Dkt. 20.)

The Government's November 20 submission does not address these allegations. It does not retract its characterization of Mr. Elmi's former travel plans as an attempt to evade prosecution. Nor does it explain the evidentiary basis for attributing a flight-related purpose to his disclosed financial transactions and foreign property ownership.

These allegations matter independently of the Government's present position concerning detention. The Government has publicly attributed an unlawful or evasive purpose to Mr. Elmi's conduct. Mr. Elmi disputes that characterization and seeks the evidence upon which it was predicated.

The Government has articulated no legal or factual basis for withholding these materials. Indeed, none of the five categories of discovery identified in Mr. Elmi's

Objection has been fully satisfied. The Government has not identified any privilege, statutory restriction, investigative concern, witness-safety consideration, or other legal or factual basis for withholding the requested materials. The deadline established by this Court for articulating such objections has passed. Mr. Elmi respectfully requests that the Court order production of the outstanding discovery.

## III. THE CONSEQUENCES OF THE GOVERNMENT'S PUBLIC ALLEGATIONS DO NOT DISAPPEAR MERELY BECAUSE IT NO LONGER SEEKS INCARCERATION.

As Mr. Elmi explained in his original Objection, this prosecution arises amid repeated public attacks on Minnesota's Somali community by the highest officials of the Executive Branch. (Dkt. 20 at 14–18.) The consequences of associating Somali identity with criminality are not abstract. They are unfolding in this community in real time.

Over the past year, allegations of fraud involving Somali Minnesotans have generated a social media feeding frenzy in which accusations of criminal conduct are disseminated to millions of people, frequently without regard for their accuracy, evidentiary foundation, or procedural posture. Social media personalities have descended upon Somali-owned businesses, published identifying information, and encouraged public suspicion of individuals and entities that have never been accused of criminal wrongdoing.

In January 2026, the Minnesota Star Tribune documented widespread harassment, threats, and the public dissemination of identifying information concerning Somali-owned businesses following the publication of a viral video

purporting to expose fraud in Minnesota. Businesses with no connection to the allegations found themselves targeted simply because they were Somali-owned. *See* Carson Hartzog, *Harassment Toward Somali Businesses Surges After Viral Video*, Minnesota Star Tribune (Jan. 9, 2026). By January 8, 2026,[1] that video had reportedly accumulated more than 140 million views across social media platforms, notwithstanding substantial questions concerning the accuracy of its representations. *See* Patrik Jonsson, *How an Influencer's Unverified Report on Minnesota Fraud Sparked White House Action*, Christian Science Monitor (Jan. 8, 2026). The phenomenon has hardly abated.

On November 20, 2026, the very day the Government filed its response in this matter, the Rosemount-Apple Valley-Eagan School District confirmed that it was investigating an employee for allegedly publishing derogatory and hostile statements concerning Muslims and Somali Minnesotans on social media. *See* Elliot Hughes, *Social Media Posts About Muslims and Somalis at Center of Rosemount High Probe*,

[1] Indeed, allegations of fraud in Minnesota have repeatedly been invoked to justify the extraordinary deployment of federal law enforcement personnel into our community in what is known as "Operation Metro Surge." Those same allegations have also served as a rallying cry for anti-Somali and anti-Muslim hostility. On January 17, 2026, just ten days after a federal immigration agent fatally shot Renee Good, Edward "Jake" Lang traveled to Minneapolis to lead a purported "March Against Minnesota Fraud," publicly announcing his intention to burn a Qur'an outside Minneapolis City Hall and march into Cedar-Riverside, a neighborhood with a substantial Somali American population. Kim Hyatt & Kyeland Jackson, *Jake Lang's Anti-Islam Rally Chased Off by Minneapolis Protesters*, Minnesota Star Tribune (Jan. 18, 2026). The consequences of publicly associating allegations of fraud with an entire community are neither abstract nor confined to the individuals accused of wrongdoing.

Minnesota Star Tribune (Nov. 20, 2026). And the consequences of this environment extend well beyond online harassment.

On November 14, 2026, just *one* day after the Government publicly accused Mr. Elmi of committing an additional federal felony and sought his incarceration, Mohamed Yusuf, a Somali American rideshare driver, suffered a brutal, life-threatening assault in Hopkins, Minnesota. According to public reporting, a relative who overheard the encounter reported that the alleged assailant expressed dislike for Mr. Yusuf's name before the attack. The incident prompted calls for a hate crime investigation and widespread concern for the safety of Somali Minnesotans. *See* Ahmed Hassan, *CAIR-MN Calls for Hate Crime Investigation After Brutal Attack on Somali Uber Driver in Hopkins*, MPR News (Nov. 16, 2026).

Mr. Elmi does not suggest that the Government's filing caused the attack on Mr. Yusuf, nor does he purport to resolve the question of the assailant's motivation. Rather, these circumstances illustrate the environment in which Mr. Elmi and his family must live and the very real consequences that can accompany public allegations of criminality.

Allegations matter. They matter when made by the President of the United States. They matter when made by the Department of Justice. And they matter when memorialized on the public docket of a federal court. The Government's allegations do not remain within the confines of this courtroom. They are publicly accessible and readily susceptible to dissemination across Instagram, Facebook, X, YouTube, and

other social media platforms.[2] They can be excerpted, stripped of context, and presented to enormous audiences as established facts rather than untested allegations. And, unlike the individuals disseminating those allegations, the Government speaks with the authority and imprimatur of the United States of America.

Here, the Government did not merely suggest that Mr. Elmi may have engaged in questionable conduct. It affirmatively represented to this Court that his actions were criminal, that he had engaged in repeated efforts to obstruct justice, that it had reason to believe his unlawful conduct extended to additional former employees, and that his international travel plans constituted an attempt to evade prosecution. (Dkt. 19.) The Government made those representations publicly. It made them against the backdrop of an ongoing social media frenzy concerning allegations of criminal conduct by Somali Minnesotans. And it made them in support of a request to deprive Mr. Elmi of his liberty.

Having now abandoned its request for incarceration, the Government nevertheless leaves those allegations on the public docket, unwithdrawn and

[2] A substantial volume of social media content specifically targets Mr. Elmi by name. Mr. Elmi and undersigned counsel have deliberately elected not to cite or reproduce that content in this filing, so as not to further amplify the vitriol or reward those who disseminate it. Even a cursory search of Mr. Elmi's name across publicly accessible social media platforms, however, reveals the volume and tenor of the hostility directed toward him personally. The decision not to reproduce that content should not be mistaken for an absence of it or an indication that its consequences are any less real.

uncorrected, while withholding the evidence necessary for Mr. Elmi to meaningfully challenge them. Mr. Elmi and his family must continue to live with the consequences of the Government's public representations. Those consequences implicate not only his reputation, livelihood, and standing within his community, but also legitimate concerns for his physical safety and that of his family.

The defense is not asking this Court to regulate social media, adjudicate the content of political speech, or resolve the broader hostility directed toward Minnesota's Somali community. The defense is simply asking for production of the evidence underlying the Government's own allegations. The Government chose to make those allegations. Mr. Elmi requested the evidence supporting them. This Court afforded the Government an opportunity to articulate a legal or factual basis for withholding that evidence. The Government has offered neither.

Mr. Elmi's willingness to entertain reasonable, prospective modifications to his conditions of release does not constitute an admission of criminal conduct. Nor does it constitute a waiver of his discovery requests or his objections to the Government's allegations. The Government should be required to produce the requested discovery.

## CONCLUSION

The Government publicly accused Mr. Elmi of committing additional criminal offenses and attempting to evade prosecution. Mr. Elmi requested five discrete categories of discovery directly responsive to those allegations. This Court directed the Government to articulate the legal and factual bases for any objection to

producing that discovery. The Government has neither confirmed that it has nor that it will fully produce any of the five categories of requested discovery nor has it articulated a legal or factual basis for withholding any outstanding materials. Its decision to abandon its request for incarceration does not remedy either deficiency.

Accordingly, Mr. Elmi respectfully requests that this Court order the Government to:

1. Produce each of the five categories of discovery identified at pages 19–20 of Mr. Elmi's Objection (Dkt. 20), including the additional communications and subsequent witness interview materials identified herein, no later than Friday, November 27, 2026;

2. Identify any requested material that does not exist or is otherwise unavailable and explain the circumstances of its nonproduction; and

3. Preserve Mr. Elmi's opportunity to meaningfully contest the Government's allegations at the November 30 hearing, including through examination of witnesses with personal knowledge of the disputed conduct.

Dated: November 25, 2026

s/ *Caroline H. Brunkow*
Caroline H. Brunkow, Reg. No. 0398936
Lotus Legal PLLC
331 Second Avenue S, Ste. 420
Minneapolis, MN 55401
(612) 293-6963
Cari@LotusLegalPLLC.com

*Counsel for Defendant*